**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**
**SENIOR JUDGE MARCIA S. KRIEGER**

Civil Action No. 18-cv-02222-MSK-STV

**7th FLOOR, LLC, and**
**KELNHOFER ENTERPRISES 4, LLC,**

      **Plaintiffs,**

**v.**

**EVANSTON INSURANCE COMPANY,**

      **Defendant.**

---

### OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to 1) the Plaintiffs' Objections **(# 81)** to the Magistrate Judge's September 24, 2019 Order **(# 80)** denying the Plaintiffs' Motion to Strike **(# 73)** an expert designation, and the Defendant's response **(# 84)**; 2) the Defendant's Motion for Summary Judgment **(# 89)**, the Plaintiffs' response **(# 94)**, and the Defendant's reply **(# 98)**; and 3) the Defendant's Motion to Exclude testimony from the Plaintiffs' expert **(# 93)**, the Plaintiffs' response **(# 97)**, and the Defendant's reply **(# 99)**.

### FACTS

The Court summarizes the underlying facts here, elaborating as necessary in its analysis. The Plaintiffs (collectively, "Kelnhofer"[1]) own various parcels of commercial real property in

---

[1] The record discloses a surprising number of variant spellings of this name. For purposes of uniformity, the Court adopts the spelling found in the caption of the case.

Colorado Springs, Colorado.  All of the properties were insured under a single casualty insurance policy with the Defendant ("Evanston").

In July 2016, a hailstorm damaged buildings on the properties and Kelnhofer made a claim under the insurance policy.  A dispute arose between the parties as to the value of the loss/claim and Kelnhofer invoked a provision in the policy that called for such dispute to be settled via an appraisal process.  Kelnhofer selected Skeet Tomlin as its appraiser and Evanston selected Ray Codgill as its appraiser. Mr. Tomlin and Mr. Codgill then selected Roy Becker to serve as umpire.  The policy provided that the agreement of any two of the three men was sufficient to fix the value of a loss/claim. In May 2018, Mr. Tomlin and Mr. Becker agreed upon a valuation of Kelnhofer's aggregate loss/claim at $530,193.  Evanston then paid that amount to Kelnhofer.

After receiving payment, Kelnhofer commenced this action **(# 4)**, asserting claims of common-law bad faith and a statutory claim for delay in payment of insurance benefits under Colorado law.  Evanston filed an Answer **(# 55)**, asserting affirmative defenses and counterclaims that alleged: (i) that Kelnhofer breached the appraisal clause in the policy in that Mr. Tomlin failed to timely provide estimates during the appraisal proceeding, arranged testing without disclosing it to Mr. Codgill, submitted duplicative and inflated estimates, and failed to disclose facts demonstrating his own partiality, among other things; (ii) what appears to be a claim requesting a declaration that vacates the appraisal award as being improper under the terms of the policy because it contains duplicative items and awards costs for undamaged property and other losses not covered under the policy; (iii) that Kelnhofer breached the misrepresentation clause in the policy by, among other things, submitting false invoices that inflated the costs Kelnhofer actually incurred for repairs to the property; (iv) a claim for recoupment, by which

Evanston seeks to recover the amounts it paid pursuant to the appraisal award; and (v) a claim for unjust enrichment, based largely on the same set of facts as the other claims.

Evanston seeks **(# 89)** for summary judgment in its favor: (i) on its counterclaim for vacatur of the appraisal award, on the grounds that Mr. Tomlin failed to disclose that he was communicating with Clark Lodge, another appraiser retained by Kelnhofer, during the appraisal; because Mr. Tomlin was paid on a contingent-fee arrangement that was not disclosed to Evanston; and because Mr. Tomlin performed destructive testing on the property without notifying Mr. Codgill or Mr. Becker; (ii) on its counterclaim for breach of contract, in that Kelnhofer breached the appraisal clause by failing to appoint a single appraiser (and instead effectively appointed both Mr. Tomlin and Mr. Lodge) and by appointing an appraiser (Mr. Tomlin) that had an undisclosed material interest in the amount of the appraisal award; (iii) on its counterclaim for breach of contract, in that Kelnhofer breached the misrepresentation clause by tendering a false invoice that inflated the cost of repairs that had actually been performed; (iv) on its counterclaim for recoupment in light of the foregoing; (v) on its counterclaim for unjust enrichment in light of the foregoing; (vi) on Kelnhofer's statutory claim for unreasonable delay, in that Kelnhofer forfeited any entitlement to payment of its claim for the reasons stated above, and because Evanston promptly paid the amount of the appraisal award; and (vii) on Kelnhofer's claim for bad faith breach, in that Kelnhofer cannot show any actions by Evanston that lacked a reasonable basis.

Separately, disputes have arisen with regard to the disclosures of opinion witnesses under Fed. R. Evid. 702.  The Court will address the details of those disputes in its analysis.

## ANALYSIS

**A. Summary judgment motion**

    1. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## 2.  Breach of the appraisal clause

To establish its counterclaim for breach of the appraisal clause, Evanston bears the burden of demonstrating: (i) that a binding agreement exists between the parties; (ii) that Evanston performed its duties under the agreement or that its duty of performance was excused; (iii) that Kelnhofer failed to perform its duties under the agreement; and (iv) that Evanston suffered injury as a result of Kelnhofer's breach.  *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  There is no material dispute as to the existence of the first two elements, and the Court turns to the question of whether Evanston has presented evidence that can show that Kelnhofer breached its duties under the appraisal clause.

The appraisal clause of the policy provides that:

> If we and you disagree on the value of the property or the amount of the loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire. . . The appraisers will state separately the value of the property and amount of the loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.

Although the policy requires that appraisers be "competent" and "impartial," the policy does not define those terms. However, both parties appear to have intended that those terms be interpreted pursuant to the Colorado Department of Regulatory Affairs ("DORA") bulletin B-5.26. For example, Mr. Codgill wrote to Mr. Tomlin, stating "In order to comply with Dora Bulletin B-5.26," he was making certain disclosures; Mr. Tomlin responded with a letter containing the same text. Thus, the Court will treat the parties as having agreed that the term "impartial," as used in the appraisal clause, would be defined according to the contents of the DORA bulletin.

In pertinent part, the DORA bulletin provides the following requirements for "fair, competent, and impartial appraisers":

> • An appraiser in the appraisal process may not have a direct material interest in the amounts determined by the appraisal process. The appraiser must disclose to all parties any known facts that a reasonable person would consider likely to affect an appraiser's interest in the amounts determined by the appraisal process, including any contingency arrangement related to payment of the appraiser.
>
> • Any insurer, insured, or [their] representatives . . . may have direct communication with their own appraiser; however, no insurer, insured, or their representative may communicate with the other party's appraiser without the consent and participation by both parties and/or their representatives. Appraisers may directly communicate with each other as part of the appraisal process in an effort to reach an agreed upon settlement amount.[2]
>
> • The appraiser shall have a continuing obligation to disclose to all parties to the appraisal process any facts the appraiser learns after accepting the appointment that a reasonable person would consider

---

[2] With regard to umpires, the bulletin adds that "The insurer[ ], insured, and their representatives . . . must not have *ex parte* communications with the umpire during the appraisal process. The umpire shall not have any communications with the insurer [ ], insured, and their representative . . ., without participation by both parties."

likely to affect the appraiser['s] interest in the amounts determined by the appraisal process.

With these provisions in mind, the Court turns to Evanston's contentions that Mr. Tomlin was not "impartial" as required by the appraisal clause.

### a. contingent fee arrangement

The DORA bulletin expressly requires that an appraiser disclose the existence of any contingent fee payment arrangement. It is undisputed that Mr. Tomlin did not disclose the existence of any such arrangement. His disclosures state that "I do not have a direct material interest in the amounts determined by the appraisal process. I charge by the hour and for expenses." Nevertheless, Evanston contends that Mr. Tomlin was paid by Kelnhofer pursuant to a contingent fee arrangement.

Evanston's evidence of such an arrangement is circumstantial. It notes that Mr. Tomlin (through his company) submitted two invoices reflecting his time spent on the case. The first invoice, dated May 9, 2018, claimed 181.25 hours at a rate of $300 per hour, for a total fee of $54,375. That invoice was apparently supported by timesheet from Mr. Tomlin. Two days later, Mr. Tomlin issued a revised invoice that claimed 199.71 hours at $300 per hour, for a total fee of $59,913, plus $4,299 in expenses. Kelnhofer ultimately paid Mr. Tomlin $57,318 in fees, a figure that differs from both invoices.[3] Evanston notes that when the $4,299 in expenses is deducted from that payment amount, Kelnhofer paid Mr. Tomlin $53,019 in fees, a sum that is precisely 10% of the appraisal award. Evanston notes that its own appraiser, Mr. Codgill, billed only $10,865 for his participation in the appraisal.

---

[3]     Kelnhofer's brief states that Mr. Tomlin "opted to discount the price of the fee to only $57,318," but cites to no evidence supporting this contention.

Because Evanston bears the burden of proof on its counterclaim for breach of contract, Evanston must show that, on the undisputed evidence discussed above, it is entitled to a judgment as a matter of law – in essence that the only factual finding that a reasonable jury could make based on this evidence is that Mr. Tomlin charged a contingent fee, rather than one based on an hourly rate. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Certainly, the correlation between the fee ultimately paid to Mr. Tomlin and 10% of the actual appraisal award raises suspicions as to whether Mr. Tomlin's fee was based on an hourly or contingent computation. Indeed, were this Court the factfinder, it might be persuaded by Evanston's evidence, particularly in the absence of any contrary explanation submitted by Kelnhofer. *See e.g. Copper Oaks Master Home Owners Assn. v. American Family Mut. Ins. Co.*, 2018 WL 353624 (D.Colo. Jul. 23, 2018) (slip op.) (as factfinder, concluding that circumstantial evidence suggested the existence of a 10% contingent fee arrangement). But the Court cannot say that this is the only reasonable conclusion a juror could draw from the evidence. Mr. Tomlin prepared a timesheet documenting his efforts and a reasonable juror might be persuaded by that timesheet to conclude that match between Mr. Tomlin's billing and a percentage of the final award is simply coincidental. Accordingly, because the Court cannot find that, as a matter of law, that Mr. Tomlin failed to disclose a contingent fee arrangement, Evanston is not entitled to summary judgment on its breach of appraisal clause claim. That claim will instead proceed to trial.

### b. communication with Mr. Lodge

The record with regard to Mr. Lodge's involvement in the appraisal is scant. The record contains what appears to be a draft agreement between Rocky Mountain Adjusters – Mr. Tomlin's firm – and Kelnhofer, in which Kelnhofer agrees to retain Mr. Lodge as its appraiser.

The record does not offer any further explanation of that un-executed agreement,[4] but it is undisputed that Kelnhofer formally proffered Mr. Tomlin, not Mr. Lodge, as its appraiser.  The record reflects that Mr. Lodge was active in corresponding with Mr. Tomlin, Kelnhofer's principal, and third parties during the appraisal, and that on several occasions, Mr. Tomlin blind-copied Mr. Lodge on certain e-mail communications that Mr. Tomlin was sending only to the other members of the appraisal panel.  For example, Mr. Tomlin wrote to Mr. Becker (copying Mr. Codgill) on April 17, 2018, complaining about certain aspects of Mr. Codgill's conduct, blind-copying Mr. Lodge on that e-mail.

Evanston has not identified any portion of the DORA bulletin that would appear to be implicated by Mr. Lodge's involvement in the e-mails in question.  Indeed, the DORA bulletin expressly provides that, as Kelnhofer's selected appraiser, Mr. Tomlin was permitted to communicate privately with Kelnhofer and its "representatives," presumably including Mr. Lodge.[5]  Nothing in the record suggests that Mr. Lodge had any direct communication with Mr. Codgill or Mr. Becker, in any way that would violate the DORA bulletin's prohibition against a party's representative having *ex parte* communications with their opponent's appraiser or the umpire.  At most, Evanston appears to be complaining that Mr. Tomlin's communications to Mr.

---

[4]    Without citation to supporting evidence, Kelnhofer's brief states that the identification of Mr. Lodge – ostensibly Mr. Tomlin's supervisor – as the appraiser in the draft agreement was simply a "clerical mistake."  It may also be that Kelnhofer initially intended to retain Mr. Lodge as its appraiser, but changed its mind after discovering that Mr. Lodge had been disqualified as an appraiser in a different case.  *Colorado Hospitality Services v. Owners Ins. Co.*, 2015 WL 4245821 (D.Colo. Jul. 14, 2015).  Ultimately, Kelnhofer's reasons for not ultimately selecting Mr. Lodge as its appraiser are irrelevant.

[5]    Evanston makes much of Mr. Becker's deposition testimony that he was "irritated" to learn that Mr. Tomlin was copying Mr. Lodge on communications among the members of the appraisal panel and that he would have "raised holy cain" if he had found out.  Once again, the DORA bulletin appears to expressly permit an appraiser to share such communications with the party that appointed them and that party's representatives, and places no particular limits on the type of information that can be shared.

Lodge breached some form of confidentiality that would attach to appraisal-related discussions among Mr. Tomlin, Mr. Codgill, and Mr. Becker, but nothing in the DORA bulletin (or any other source imposing duties on appraisers and umpires) purports to recognize any such duty of confidentiality. Evanston argues, hyperbolically, that Mr. Tomlin's communications with Mr. Lodge amounted to making Mr. Lodge "a fourth member of the appraisal panel." But there is no evidence that Mr. Lodge communicated with anyone other than Mr. Tomlin at any time, or that Mr. Lodge had any ability to influence the outcome of the appraisal proceeding except through Mr. Tomlin. In such circumstances, the Court cannot conclude that Evanston has demonstrated that, as a matter of law, Mr. Tomlin's inclusion of Mr. Lodge in communications violated any of Mr. Tomlin's obligations under the DORA bulletin. Evanston's request for summary judgment on this ground is denied.

### c. undisclosed testing

The record on this point is, again, sparse. In March 2018, during the appraisal, someone – the record does not make clear[6] -- arranged for an entity called "Roof Leak Detection" to perform a "desaturation test" on roof samples that had been "removed by Pivot Adjusters."[7] At some point, Mr. Codgill became aware of the existence of that testing and wrote to Mr. Tomlin, requesting a copy of the test report and stating that "the fact that this happened without my knowledge or consent is very concerning." Mr. Becker testified that having such testing done without informing all the members of the appraisal panel was "a little peculiar," "highly irregular," and "not real ethical."

---

[6]     The test report identifies Mr. Lodge as the "contact individual."

[7]     Other evidence in the record seems to indicate that Mr. Lodge has some affiliation with Pivot Adjusters.

The Court notes here that Evanston's claim for breach of the appraisal clause is predicated on the notion that Kelnhofer's appointed appraiser, <u>Mr. Tomlin</u>, was not impartial (as that term is defined by the DORA bulletin).  With regard to this issue, then, the focus must be on what actions <u>Mr. Tomlin</u> performed. As the recitation above indicates, it is not clear that Mr. Tomlin had any involvement with retaining Roof Leak Detection or requesting the desaturation test.  To the extent the record discloses anything about that question, it seems to suggest that Mr. Lodge, not Mr. Tomlin, requested the testing.  Indeed, the record gives no indication of when Mr. Tomlin learned of the testing or what actions he took upon learning of it.  In such circumstances, Evanston has not come forward with evidence that demonstrates, as a matter of law, that Mr. Tomlin initiated, knew of, or concealed his knowledge of the testing from Mr. Codgill or Mr. Becker.  Thus, Evanston is not entitled to summary judgment on its claim for breach of the appraisal clause.

### 3.  <u>Breach of the misrepresentation clause</u>

The misrepresentation clause of the policy provides that "this Coverage part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you . . . at any time, intentionally conceal or misrepresent a material fact concerning . . . a claim under this Coverage Part."

On August 24, 2018, an attorney with the law firm representing Kelnhofer in this matter wrote to Evanston, asking Evanston to "release the associated depreciation" and tendering an invoice and Certificate of Completion indicating that Kelnhofer had paid Rocky Mountain Enterprises ("RME") a total of $382,798 for roof repairs.  In actuality, Kelnhofer had only paid RME a total of $308,000.  Evanston contends that Kelnhofer thus violated the misrepresentation clause by knowingly and intentionally presenting a false invoice.  In response, Kelnhofer does

not appear to dispute that it supplied Evanston with an invoice that reflected more than Kelnhofer had actually paid RME, but argues that it did not intend to deceive Evanston and that Kelnhofer's principal "misunderstood the purposes of the withheld depreciation."

Neither party has tendered a definition for the term "fraud" in the misrepresentation clause, but assuming the ordinary use of the word, Evanston must not only show that Kelnhofer made a false statement of fact, but that it did so intentionally for the purpose of misleading Evanston. *See generally Concord Realty Co. v. Continental Funding Corp.*, 776 P.2d 1114, 1117-18 (Colo. 1989). Evanston has not come forward with evidence that would suggest that Kelnhofer was both aware of the discrepancy between the invoice amount and what it had paid RME, nor that Kelnhofer was intending to mislead Evanston regarding that discrepancy. The only evidence that Evanston points to in order to establish Kelnhofer's intent is a passage from the deposition of Kelnhofer's principal, in which Kelnhofer states that it intended to use the funds from the payment of the invoice to pay for additional repairs. But such a statement sheds no light on Kelnhofer's awareness of the existence of a discrepancy, much less on its intention to mislead Evanston. The fact that a payment from Evanston would be used to finance further repairs is simply a statement of cash flow priorities – perhaps Kelnhofer was prepared to delay making final payment to RME, or that Kelnhofer had already tapped other resources to pay RME, such that payment of RME's invoice by Evanston could be devoted to other repairs – not necessarily evidence of an intent to mislead. Accordingly, because Evanston has not come forward with evidence that establishes Kelnhofer's fraudulent intent as a matter of law, Evanston's claim for breach of the misrepresentation clause must be considered by the jury.

4. <u>Remaining claims</u>

Evanston's arguments seeking summary judgment on its remaining counterclaims – sounding in recoupment and unjust enrichment – as well as its arguments for seeking summary judgment on Kelnhofer's own claims are all predicated on Kelnhofer's breach of the appraisal and/or misrepresentation clauses.  Because the question of whether Kelnhofer breached those clauses must be resolved at trial, Evanston's arguments for obtaining summary judgment on the remaining claims fail as well.

Accordingly, Evanston's motion for summary judgment is denied.

**B.  Kelnhofer's Objections to Magistrate Judge's Ruling**

The Scheduling Order (**# 28**, as amended **# 69**) called for disclosure of expert witnesses in two phases: affirmative experts were to be disclosed by August 12, 2019, and rebuttal experts would then be disclosed by September 3, 2019.  In August 2019, Kelnhofer timely identified Britta Moss as its expert on the issue of insurance claims handling, and Evanston disclosed Peter Evans as its expert on the same issue.  At the September deadline, Evanston again identified Mr. Evans as its expert to rebut Ms. Moss' affirmative opinions, and tendered Mr. Evans' rebuttal report.  Due to an oversight, Kelnhofer did not timely designate a rebuttal expert.  A few days later, Kelnhofer moved (**# 70, 73**) for leave to modify the Scheduling Order to permit it to designate Ms. Moss as a rebuttal expert to oppose Mr. Evans' opinions, or to strike Mr. Evans' designation as an expert because Evanston "has no affirmative claims on the topic of bad faith conduct" and thus, it was improper for Evanston to designate an affirmative expert (as opposed to a rebuttal expert) to opine on this issue of bad faith.  Kelnhofer also tendered a rebuttal report from Ms. Moss that responded to not only Mr. Evans' initial report, but also to his recently-filed <u>rebuttal</u> report.  *Docket # 73-2* ("Thank you for the opportunity to review and respond to Peter S.

Evans' opinions in this matter as outlined in his Expert Opinion Report and Expert Opinion Rebuttal Report").  In response **(# 77)**, Evanston suggested that, if the Magistrate Judge were inclined to permit Kelnhofer to tender Ms. Moss' late rebuttal report, that the Magistrate Judge permit Evanston the opportunity to file a <u>sur-rebuttal</u> report, addressing that portion of Ms. Moss' rebuttal report that improperly responded to Mr. Evans' rebuttal report.

By Order dated September 24, 2019 **(# 80)**, the Magistrate Judge denied that part of Kelnhofer's motion that sought to strike Evanston's designation of Mr. Evans as an expert.  The Magistrate Judge granted Kelnhofer's request to designate Ms. Moss as a rebuttal expert, but also granted Evanston's request for the opportunity to present a sur-rebuttal report by Mr. Evans.  The Magistrate Judge required that Kelnhofer "pay the cost for the sur-rebuttal report for up to two hours of the expert's fees."

Kelnhofer then filed timely Objections **(# 81)**, arguing: (i) that "allowing a Defendant to have an affirmative expert o[n] its affirmative defenses drastically increases the cost of litigation and presents confusing issues of trial presentation later on in the case"; and (ii) that "allowing a Defendant to disclose an affirmative witness on an issue where the burden of proof lies with the Plaintiff should be construed as allocating the burden of proof to the wrong party" and is "reversable error."

Pursuant to 28 U.S.C. § 636(b)(1)(A), the Court reviews discovery rulings made by the Magistrate Judge to determine whether they are "clearly erroneous or contrary to law."  *See also* Fed. R. Civ. P. 72(a).  Under the "clearly erroneous" standard, the Court must affirm the ruling unless the Court has "a definite and firm conviction" that the Magistrate Judge "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  *Allen v. Sybase, Inc*, 468 F.3d 642, 658 (10th Cir. 2006).

Fed. R. Civ. P. 26(a)(2)(D) does not make any explicit reference to "affirmative" and "rebuttal" experts.  Indeed, the rule focuses on disclosure of "opinions", not the people who offer them – expert witnesses. At most, the rule recognizes that the deadline for disclosure of opinions that are "intended solely to contradict or rebut evidence on the same subject matter identified by another party" may be closer to trial than the deadline for disclosing  other expert opinions.  Fed. R. Civ. P. 26(a)(2)(D)(ii).  Thus, the common practice of identifying expert witnesses as "affirmative" or "rebuttal" experts is not required by the rule, and has no particular significance. It is necessary only to identify the opinions that "rebut" those previously offered, and that designation is primarily for the purpose of determining whether disclosures of the opinions have been made on a timely basis.[8]

Nothing in the Federal Rules or otherwise dictates that only the party with the burden of proof on a claim can designate an "affirmative expert," relegating its opponent to only offering expert testimony in rebuttal.   *See Bonser v. Waste Connections of Colo., Inc.*, 2020 WL 1986477 (D.Colo. Apr. 27, 2020) (slip op.) ("Affirmative experts also serve to contradict an expected and anticipated portion of the other party's case-in-chief").  Indeed, even the cases that Kelnhofer relies upon recognize that "if the purpose of expert testimony is to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one," and must, by definition, therefore be an affirmative expert. *Spring Creek Exploration & Prod. Co. v. Hess Bakken Investment II, LLC*, 2016 WL 1597529 (D.Colo. Apr. 21, 2016) (slip op.).  It is entirely permissible for a party to

---

[8]     All of the cases that Kelnhofer relies upon concern the question of whether an expert identified within the shorter "rebuttal" deadline was actually an affirmative expert that was should have been disclosed earlier as an "affirmative" expert under the Rule 26(a)(2)(D)(i) deadline.  None of Kelnhofer's cases stand squarely for the proposition that only the party with the burden of proof on an issue can designate an affirmative expert.

designate an expert opinion with regard to an issue on which its opponent carries the burden of proof in addition to opinions that rebut opinions given by the opponent's expert.  *Id.*  Thus, a rule like that urged by Kelnhofer – one in which the party without the burden of proof would be limited to offering rebuttal expert testimony -- would allow the party with the burden of proof to strategically control its opponent's ability to proffer relevant and probative opinion testimony.  Imagine, for example, a situation in which the plaintiff must prove that an accident was caused through a particular course of events – mechanism A.  The defendant might have an expert who is prepared to testify that the evidence suggests that it is more likely that an entirely different course of events – mechanism B  -- actually caused the accident.  If the defendant's expert is only allowed to rebut the plaintiff's affirmative contentions, that defense expert's testimony might be constrained to only being able to opine that the cause of the accident was "not mechanism A," and would not be able to offer the affirmative opinion that the cause "was mechanism B."  Such a result would unnecessarily constrain the search for truth.  Neither the rules nor applicable caselaw can be so construed.

Thus, this Court cannot conclude that the Magistrate Judge erred in concluding that Evanston was permitted to timely identify Mr. Evans as an affirmative expert on claims handling practices, even though those practices are only relevant to claims on which Kelnhofer bears the burden of proof.

Nor can the Court conclude that the Magistrate Judge erred in allowing Evanston to offer a sur-rebuttal report from Mr. Evans in response to Ms. Moss' rebuttal report.  The purpose of the disclosure of an expert reports is to give notice to the opposing party of opinions to be offered and how they were derived.  Essentially, Kelnhofer's contention is that no sur-rebuttal

report should be allowed, with the apparent purpose of prohibiting the presentation of the opinions in the sur-rebuttal report at trial.

As discussed above with regard to deadlines for timely disclosure, the Federal Rules of Civil Procedure do not address the issue of sur-rebuttal expert reports, and thus, the Magistrate Judge possesses the discretion to permit sur-rebuttals and other additional responsive expert reports as the circumstances may warrant. *See e.g. Coward v. Forestar Realty, Inc.*, 282 F.Supp.3d 1317, 1331 (N.D.Ga. 2017) ("Generally, sur-rebuttal reports . . . require prior permission from the court"). Here, it is undisputed that Kelnhofer's delay in tendering Ms. Moss' rebuttal report addressed not only Mr. Evans' affirmative report but also his rebuttal report. Had Kelnhofer abided by the Scheduling Order's deadlines, Ms. Moss' rebuttal report would have been submitted simultaneously with Mr. Evans' rebuttal report, and each party's witness would have addressed only the opinions in the other's "affirmative report". It was not an abuse of the Magistrate Judge's discretion to conclude that Kelnhofer's delay unfairly gave Ms. Moss a greater opportunity to respond than Mr. Evans was given, and that such unfairness could best be rectified by allowing Evanston to submit a sur-rebuttal report to those portions of Mr. Moss' rebuttal report that commented on Mr. Evans' rebuttal report.

Finally, to the extent that the Magistrate Judge determined that Kelnhofer should pay the cost of Mr. Evans' preparation of a sur-rebuttal report, this Court cannot conclude that the Magistrate Judge's decision was clearly erroneous or contrary to law. There is no Federal Rule of Civil Procedure that controls in such cases, leaving the matter to the Magistrate Judge's discretion. And it is clear that the Magistrate Judge found that Kelnhofer was solely culpable for the delay in producing Ms. Moss' rebuttal report, such that Kelnhofer should bear the costs of remedying the situation. Certainly, Kelnhofer could have avoided the situation – and the cost –

by offering to withdraw those portions of Ms. Moss' rebuttal report that commented on Mr. Evans' rebuttal, but the transcript of proceedings before the Magistrate Judge do not indicate that Kelnhofer ever made such an offer.  In these circumstances, the Court sees no error in the Magistrate Judge deciding to apportion the cost of a sur-rebuttal report by Mr. Evans to Kelnhofer.

Accordingly, Kelnhofer's Objections are overruled and the Magistrate Judge's ruling is affirmed.

### C.  Evanston's Rule 702 Motion

Evanston moves to exclude Ms. Moss' testimony under Fed. R. Evid. 702.  Summarized, Ms. Moss' opinion is that Evanston breached common insurance industry claims handling standards by not making an early payment for losses for which coverage was uncontested for which at least a minimum amount of benefits were indisputably owed.  Evanston contends that Ms. Moss applied an unreliable methodology (and failed to adequately apply that methodology) by refusing to consider events that occurred later, during and after the appraisal process, such as Kelnhofer's alleged misrepresentations about the RME invoice.

The Court need not embark upon an elaborate analysis to resolve this matter.  As the party proffering the witness, Kelnhofer bears the burden of showing that Ms. Moss' opinions are admissible.  *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013).  With regard to the question of appropriate methodology, Kelnhofer has produced evidence – Ms. Moss' own say-so – that a review of early claims handling decisions without consideration of later appraisal proceedings is an appropriate methodology for assessing the reasonableness of an insurer's delay.  Thus, Evanston has the burden of adducing contradictory evidence – that is, evidence from another witness (or, perhaps, elicited from Ms. Moss herself) that the methodology Ms.

Moss describes is <u>not</u> generally-accepted among those with expertise in insurance claims handling. Evanston has not done so. It has not proffered evidence from its own expert or from others, nor did it elicit a confession from Ms. Moss that her own methodology was unreliable. In the absence of evidence rebutting Ms. Moss' testimony about the reasonableness of her methodology, Evanston's Rule 702 challenge on that point fails.[9]

Evanston also challenges Mr. Moss' collection of sufficient facts and data and her application of the methodology to those facts and data, but those arguments are effectively the same as those discussed above. Whether the facts and data upon which Ms. Moss relied are sufficient or the methodology was reliably applied to them is tied to Ms. Moss' methodology. The methodology determines both the facts and data to be considered and how to do so. Ms. Moss' opinions are based upon a snapshot of Kelnhofer's claim as it existed in or about August 2016, and nothing in Ms. Moss' stated methodology requires her to consider events that might have occurred during the appraisal many months later. Thus, although Evanston believes that a

---

[9] In any event, the Court is not persuaded that Ms. Moss' failure to consider events during and after the appraisal proceeding render her opinions about errors that Evanston made early in the claims handling process unreliable. Evanston's theory is that, although Kelnhofer's loss may have initially been subject to coverage under the policy, Kelnhofer's misconduct during the appraisal proceeding operated to revoke any such coverage. But Ms. Moss' opinions only address Evanston's obligations that arose <u>before</u> any appraisal-related misconduct occurred, and she offers no opinions about what happened during the appraisal or the consequences that would flow therefrom.

In essence, Ms. Moss' opinions are the sort of "conditional" opinions this Court discussed in *U.S. v. Crabbe*, 556 F.Supp.2d 1217, 1224 (D.Colo. 2008). Ms. Moss opines that Evanston had an obligation to pay certain undisputed benefits in or about August 2016, because Evanston did not dispute coverage for the loss at that time. The fact that subsequent events – *i.e.* the appraisal proceedings in 2018 – may have operated to change the question of coverage, those subsequent events do not render Ms. Moss' opinions about obligations in August 2016 to be unreliable. Rather, it may be appropriate to simply prepend an assumption onto Ms. Moss' stated opinion: "<u>assuming no subsequent changes affecting the question of coverage</u>, Evanston should have made certain payments in August 2016." If Evanston can demonstrate at trial that there <u>were</u> subsequent changes affecting the question of coverage, it can argue to the jury that those changes render Ms. Moss' opinions unpersuasive.

19

different methodology should have been used, it has not come forward with evidence that Ms. Moss failed to reasonably apply the methodology she identified. Accordingly, Evanston's motion is denied.

## **CONCLUSION**

For the foregoing reasons, Kelnhofer's Objections **(# 81)** are **OVERRULED** and the Court **AFFIRMS** the Magistrate Judge's September 24, 2019 Order **(# 80)**. Evanston's Motion for Summary Judgment **(# 89)** and Motion to Exclude **(# 93)** are **DENIED**. The parties shall jointly contact chambers to schedule a Pretrial Conference.

Dated this 8th day of August, 2020.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge